IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 29, 2020

**STATE OF TENNESSEE v. TAMMY LYNN WALKER**

**Appeal from the Criminal Court for Campbell County**
**No. 2018-CR-17814     E. Shayne Sexton, Judge**

———————————

**No. E2019-00501-CCA-R3-CD**

———————————

Following a bench trial, the Defendant, Tammy Lynn Walker, was convicted of passing a worthless check, a Class D felony.  On appeal, the Defendant contends that the trial court erred in determining that she made a knowing and voluntary waiver of her right to counsel and by requiring her to proceed pro se at trial when she had not executed a written waiver to the effect.  The State, after initially contending that the trial court did not err, alternatively argues that the Defendant implicitly waived her right to counsel by failing to retain counsel in a timely manner.  In addition, the Defendant, as a separate issue, contends that the trial court violated her constitutional rights when it compelled her to testify against herself.  We conclude that the non-indigent Defendant knowingly and voluntarily explicitly waived her right to counsel by her statements and conduct and that she was not compelled to testify against herself.  Accordingly, the judgment of the trial court is affirmed.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Richard L. Gaines and Jeffrey Z. Daniel, Knoxville, Tennessee (on appeal); and Tammy Lynn Walker, LaFollette, Tennessee, Pro Se (at trial), for the appellant, Tammy Lynn Walker.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Jared R. Effler, District Attorney General; and David M. Pollard, Jr., Thomas E. Barclay, and Lindsey C. Cadle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

According to the affidavit of complaint, the Defendant, on May 12, 2016, wrote a check to the Campbell County Clerk and Master's office ("the Clerk's Office") in the amount of $5,610.51 as payment for taxes owed on two LaFollette properties, 511 Prospect and 221 Fairway, and one Caryville property, 473 Ridge Road. She wrote this check one day before the properties were scheduled to be sold by the Clerk's Office. The check was returned to the Clerk's Office due to insufficient funds. The Clerk's Office attempted to contact the Defendant by telephone and certified mail, with no results. On January 10, 2018, the Campbell County Grand Jury indicted the Defendant for passing a worthless check in an amount of $1,000.00 or more but less than $10,000.00.[1] See Tenn. Code Ann. § 39-14-121.

On March 19, 2018, the Defendant appeared in court for arraignment. At the outset, the trial court indicated, "I have a note she was to retain counsel." The prosecutor indicated that this was "the third setting." The Defendant said that she was "in the process of retaining Robert Carter from Tullahoma," but that Mr. Carter had "a murder trial today, so [she would] be representing herself." When the prosecutor advised the trial court that he had not been contacted by any attorney on the Defendant's behalf, the trial court asked the Defendant, "You're gonna represent yourself for trial?" The Defendant replied, "Until I let him get in so—but he told me to tell you that he had a conflict today but that I would be representing myself." The colloquy between the Defendant and the trial court continued:

THE COURT: We've had no notification from anyone. That's not how this [c]ourt operates . . . . Now, if you want to represent yourself, everyone has a right to defend him or herself at trial, provided you make certain representations to me that you can conduct yourself.

THE DEFENDANT: I just didn't want another delay.

THE COURT: Well, we're not gonna delay it. I mean, if you want to proceed on your own, then I'm going to ask you some questions under oath. Please raise your right hand.

Under oath, the Defendant informed the trial court that she was fifty-six years old and that she had a college degree in "[b]usiness management, computer programming, . . . an accounting degree." When asked if she had studied the law in any respect, the Defendant said, "Just contracts. I've studied business contracts which was a legal minor in that." The Defendant affirmed her awareness of both the United States and Tennessee Constitutions

---

[1] Given the amount of the check, the felony classification of the Defendant's crime has not changed, though the valuation of theft statute grading statute has been amended, and a Class D felony is now valued between $2,500.00 or more but less than $10,000.00. See Tenn. Code Ann. § 39-14-105 (2019).

"that would protect [her] in certain areas concerning law enforcement and cases that [she] might be subject to go to trial on," but she indicated that she had never read "those."

The Defendant further affirmed her awareness that she had "a right to a lawyer at any critical stage in [c]ourt" and that she had "a right to an appointed lawyer if [she could not] afford one." When asked if there was "some particular reason why [she was] proceeding on [her] own rather than hiring—have you hired Mr. Carter," the Defendant replied that she had "only met [with Mr. Carter] the first time," that she "wanted to get counsel outside the area," that he was "in the middle of a murder of trial," that he would "be partnering with another attorney" in Tullahoma, and that she was simply doing as he instructed. The trial court indicated that it would assume the Defendant was "pro se until such time as someone substitute[d] in" and that any attorney would have to "take the calendar" as set at this hearing.

The trial court then reviewed with the Defendant that she was charged with a Class D felony and faced a prison sentence of two to twelve years with a maximum $5,000.00 fine. The trial court also explained to the Defendant that she would be "held to the same level of competence as any lawyer that[ had] been matriculated through the system," and the Defendant stated that she understood. She was also told that there were "court rules . . . that appl[ied] exclusive[ly] to here that [the Defendant] would not necessarily find in a law book, however, they [were] posted and published." The Defendant said that although she did not know of the local rules previously, she now considered herself to be so informed. The trial court indicated that it would provide a copy of the local rules to the Defendant. In conclusion, the trial court determined, "I'm going to find that you have knowingly and intelligently waived your right to counsel, and you may proceed pro se."

The trial court then asked the Defendant if she was ready for her arraignment. The Defendant responded, "It's—that's just to set my trial date, correct?" The trial court explained, "No. Well, there are scheduling issues, but there's one—we must conduct a— an arraignment means you've been presented with the charging instrument, that you understand the charges that you are facing and that you are ready to enter a not guilty plea and go forward." The Defendant indicated that she was prepared to do that. The case was set for a status update on April 9.

The prosecutor stated that he would need some way to communicate with the Defendant if she were proceeding pro se. The trial court suggested to the Defendant that she have "direct contact" with the district attorney's office because there were "discovery motions that [she] should be preparing to file" and that the district attorney's office would forward her whatever discovery materials to which she was entitled. The Defendant indicated that she desired to speak with the district attorney's office directly, so the trial court told her to provide the prosecutor with her information.

A "status call" took place on April 9, 2018. The prosecutor requested that the case be placed for a final status update on May 21. The trial court noted that the Defendant was present and was proceeding pro se, stating, "I think we went through that process before." When asked if May 21 was acceptable, the Defendant indicated that she would "need more time," that she would need "to get familiar with the protocol," and that she "should have counsel . . . helping by then." The prosecutor stated that the Defendant's "attempt to enter a pro se status . . . was only to get a delay to get retained counsel" and that nothing had happened since the last time the Defendant was in court. The prosecutor averred that the Defendant approached him that morning asking for discovery and that he explained to her that no motions had been filed, which she had to do pursuant to the rules of procedure. The prosecutor commented, "She's representing herself. She's doing so at her own peril. This case is not gonna move unless she does something or she gets counsel, and to just continue her delay tactics is just—shouldn't be permitted." The Defendant remarked that she was not using delay tactics and explained that she had been in immigration court in Louisiana for two weeks, for which she could provide verification if needed.

The prosecutor then requested, "If she wants to get counsel, then I'm gonna ask that it be called on April 30th to appear with counsel or be subject to forfeiting her bond." The trial court noted that if the Defendant was present in court, then there was no reason to revoke her bond. However, the trial court stated, "I don't have to dance around with this," and set the case for a final status hearing on June 18th. The trial court informed the Defendant, "By then, we're either gonna set—this case is going to be set for trial, and if you hire counsel after that, counsel will take the calendar that comes with the case." After the Defendant affirmed her understanding, the trial court commented, "So, we're gonna—this thing will not—this is not a parking lot, this is a freeway, we're gonna move."

Another status call took place on June 18, 2018. The trial court noted that the Defendant was proceeding pro se, and the Defendant responded affirmatively. Discussion ensued on setting the case for trial. The trial court asked the Defendant if she desired a jury trial or desired to waive that right, to which the Defendant indicated that she had filed a motion for a change of venue. The Defendant explained that she wanted the case moved to a different county so "it would be cheaper for [her]" to hire an attorney that she had "been trying to get." The trial court then informed the Defendant that though it would entertain such a motion if she filed one, the case could not be moved at "[her] pleasure" and would be heard in Campbell County.[2]

The trial court subsequently asked, "We're not—you want to move the case to your lawyer?" The Defendant then discussed issues related to whether she could get a fair jury in Campbell County. The Defendant claimed that a state investigator "incited a meeting" at her business and that the "newspapers, everybody showed up," including the prosecutor

---

[2] No motion for a change of venue appears in the record on appeal.

who "came and passed out his business cards." The Defendant said that she had received death threats, that people had "block[ed her] building," and that she had to close all her "businesses in the county." The trial court then informed the Defendant that she could waive her right to a jury trial if she desired and have a bench trial, to which the Defendant said that she had confidence in the trial court. The Defendant indicated that after her last court date, she had been stopped by the police three times. The trial court remarked that if the Defendant were concerned with fairness, then such concern would be alleviated by allowing the trial court to try the case without a jury. The Defendant stated, "I would be willing to do that, yes, sir." The trial court noted that there was a written waiver of the right to a jury trial that the Defendant would need to execute.

Because the Defendant was waiving her right to a jury trial, the trial court indicated that the case could be tried in one day, to which the State agreed. When the prosecutor informed the trial court of the charge, the Defendant said, "Your Honor, that check has been paid for almost two years." The trial court told the Defendant that she could raise her defenses at trial, but that the State had the "election to proceed."

The transcript indicated that the Defendant then signed her jury trial waiver in open court. The written waiver stated that she had been "fully advised" of the right to trial by jury and was waiving that right. The prosecutor also signed the document, indicating that the State likewise assented to a bench trial.

The case was set for trial on December 13, 2018. The trial court reminded the Defendant, "And you understand representing yourself, you are held to the same level of conduct and competence that a lawyer would be when it comes for purposes of trial?" The Defendant indicated her understanding but clarified, "Now, I do have a right to retain a lawyer between now and then if I can get one, correct?" The trial court replied affirmatively but said that the lawyer would be required to "take the schedule."

The trial court also advised the Defendant that if she hired a lawyer, then she would need to inform him or her that she had waived her right to a jury trial. The trial court explained to the Defendant, "I'm not sure your lawyer would go along with that." The Defendant then reported that she had "consulted a couple of" lawyers but that "the issue [was] money." The Defendant continued, "The one, if I can get him—there's two, and I've kept them abreast of what's been going on." The trial court replied, "Well, we'll proceed as if we're—we know where we're going for now." The trial court then set the discovery deadlines and asked that the Defendant be given a copy of the scheduling order. In conclusion, the trial court inquired if the Defendant had any additional questions, and she said that she did not. The trial court also asked, "Do you understand we've calendared the case for trial, non-jury in December?"; the Defendant indicated her understanding.

On the day before trial, December 12, 2018, the Defendant filed a pro se motion to dismiss. In the motion, the Defendant alleged that she had repaid the bank on June 17, 2017, for the insufficient funds check. She also asserted that she made a "first attempt" on March 9, 2017, to pay the Clerk's Office as instructed by the district attorney's office. According to the Defendant, the Clerk's Office "refused to accept the cashier's check because the case had not been pled so there was nothing to pay it against in their office." She claimed that she then went directly to the district attorney's office and tried to pay the amount but that they also would not accept payment "until the case was pled." The Defendant continued,

> Between court dates, my home was foreclosed on and FNB purchased the residence from the s[ale] and had to satisfy the tax debt before the s[ale] could be completed. They paid the tax debt and charged the taxes to my existing bank note then applied the tax payment back to the loan the following week when I paid them cash for the tax debt.

The Defendant concluded, "Based on this evidence, there is absolutely no evidence that I tried to defraud the State of Tennessee or Campbell County."

She attached a copy of a cashier's check dated March 9, 2017, payable in the amount of $5,610.51 to the Campbell County Circuit Court. A notation on the back of the check indicated that the check was "not used for intended purpose." It was stated at the bottom of the paper, "redeposited got cash from Garza law firm." She also attached documentation regarding payment to the Clerk's Office for delinquent taxes—one for Melinda Shiflet on May 12, 2017, in the amount of $2,420.96, and another for the Defendant on May 12, 2017, in the amount of $4,797.75. There was also an email from the credit secretary of First National Bank to one Bryan Horton, stating that though the check was dated May 12, 2017, "it didn't get added back to the loan" until June 5, 2017.

In the motion, the Defendant also stated that both she and her attorney, Marcos Garza, had been told that if she paid the check, the case against her would be dismissed. According to the Defendant, either Mr. Garza had not proffered the evidence that she satisfied the tax, or the case against her became personal as indicated by several Campbell County attorneys who "refused to represent [her] because they said, representing [her] would hurt their future dealings with the [district attorney's] office."

At the outset of the December 13, 2018 trial, the trial court noted that the Defendant had waived her right to a jury trial. The trial court then inquired about the Defendant's motion to dismiss. After hearing the arguments of the parties, the trial court denied the Defendant's motion, ruling that it did not matter whether the money had been repaid and

- 6 -

that the State could still prosecute the case. Also, during this discussion, the Defendant indicated that she originally had an attorney when this case was in general sessions court.[3]

Before the reading of the indictment, the trial court recognized again that the Defendant was proceeding pro se and repeated that the Defendant would be held to a certain "level of competence." When the trial court asked the Defendant if she had any questions, the Defendant said,

> The only thing, your Honor, is I have approached four attorneys and they wouldn't touch it because they said this was—since this had been paid it was personal and that it would—they could not jeopardize their future dealings with the [district attorney's] office. And so, I could not get local representation and could not afford someone out of town, so I have to proceed for myself.

The prosecutor[4] noted that attorneys "do it all the time" and that he had "legal fights in this [c]ourtroom weekly." The Defendant continued, "Well, I know they just couldn't believe that since this was paid that it went to this degree, that everyone I've talked to can't understand it since it was satisfied back before it ever got to [c]riminal [court], so I don't know." The trial court did not respond and proceeded with the reading of the indictment, after which the Defendant pled not guilty.

Witnesses were discussed, as well as the Rule of Sequestration. The State indicated that it intended to call the Clerk and Master and possibly Ms. Joan Pittman. The Defendant was asked if she had any witnesses she wanted sworn or if she wanted to be sworn at that time. The Defendant replied affirmatively. The transcript indicated that "the aforementioned witnesses were sworn."

Dennis Potter, the Campbell County Clerk and Master, testified that part of his responsibilities included the collection of delinquent taxes and that in 2016, the Defendant fell into arrears on certain real property taxes. Mr. Potter was asked to describe the procedure used to enforce tax collection, and he stated that the Clerk's Office sent out notices "to everybody" letting them know that if taxes were not paid by a certain date, then the property would be sold during the annual tax sale in May. Specifically, regarding the Defendant, Mr. Potter indicated that the Defendant received notice by mail that she had property that was subject to a tax sale on May 13, 2016, if she did not pay her delinquent

---

[3] In addition, it was noted by the prosecutor at the sentencing hearing that the Defendant was represented by an attorney during the "probable cause" hearing on this case in general sessions court.

[4] The transcript attributes this statement to the trial court. However, from its context, and the reference to "your Honor," we infer that the statement was made by the prosecutor.

tax. Mr. Potter further explained that the Clerk's Office also advertised delinquencies in the newspaper. Mr. Potter averred that the Clerk's Office tried "to get the message out to everybody" about the pending sale because his office did not desire to have to sell the property.

According to Mr. Potter, the Defendant came into the Clerk's Office on May 12, 2016, one day before the scheduled sale, and paid her taxes with a check from "The Diner" for $5,610.51, signed by the Defendant. The check was for delinquent taxes on three parcels of land, two owned by her and one by a Melinda Shiflet. Though the check did not have time to process through the bank, the Clerk's Office canceled the tax sale of the three parcels, which was scheduled for the following day. Mr. Potter testified that the Defendant's check later was returned by First National Bank in LaFollette due to insufficient funds. Mr. Potter indicated that due to this specific case, the Clerk's Office had changed its policy and now required payment by cash or certified funds if within two weeks of the sale.

Mr. Potter was asked about what steps the Clerk's Office took to notify payees of dishonored checks. Mr. Potter stated that the Clerk's Office sent notice of the dishonored check to the Defendant by registered mail. The letter was postmarked June 2, 2016; it was returned to the Clerk's Office on June 22, 2016, as unclaimed. According to Mr. Potter, the notice was sent to the address of record, "The Diner," P.O. Box 187, Caryville, which was a business operated by the Defendant, and the same address on the dishonored check.

Mr. Potter also believed that the Clerk's Office attempted to telephone the Defendant to inform her of the dishonored check. Mr. Potter opined that the Clerk's Office would have "sent out as much notice" as possible, desiring that the check be made good.

Mr. Potter testified that the taxes on the Defendant's property remained unpaid and that the property was therefore scheduled once more for a tax sale the following year in May 2017. Mr. Potter again claimed that the Clerk's Office notified all interested parties, including the Defendant, "the banks, anybody that had securities or a secured position against the property." Mr. Potter stated that in this case, the bank stepped in and paid the delinquent taxes to avoid the tax sale and secure their lien on the property. Mr. Potter asserted that the Defendant never came to the Clerk's Office and tried to satisfy the delinquent tax liability prior to the scheduled May 2017 sale, either before or after the bank had paid.

On cross-examination, Mr. Potter acknowledged that sometimes another party paid delinquent property taxes on a property owner's behalf and that he would not have been privy to any agreement of repayment between the Defendant and her bank. Mr. Potter confirmed that there was "a redemption period" after the tax sale, allowing a party to redeem their property one year from the date of the sale; that the property could not change

hands during that period; and that the bank would likely have been aware of that information. Mr. Potter further indicated that he was not aware of any circumstances that might have caused the insufficient funds and the dishonored check. He also affirmed that it was possible that the Defendant was ill, out of town, or there was some other reason why she may have not been able to pick up the notice of the dishonored check, though Mr. Potter remarked that it was the Defendant's responsibility to keep her address current with the county.

That concluded the State's proof. The trial court asked the Defendant if she had "any argument before [she] present[ed her] side of the case?" When the Defendant replied in the negative, the trial court informed her as follows:

> At this juncture, the State has rested [its] proof. They'll be putting nothing else in the direct case. And if you've—if you want to make an argument for—such as a judgment of acquittal stating that the—setting out that the State has not put on an adequate case, you may do that. If you don't, you may proceed directly into your proof. I'm not exactly sure how you intend to get your proof in without being questioned. Let's take this one thing at a time. Do you wish to argue for a dismissal again?

The Defendant indicated that she did wish to make an argument for a motion for a judgment of acquittal. Following argument, the trial court denied her motion.

> In denying the motion for judgment of acquittal, the trial court stated,
>
> The statute is clear about notice, and it's evident from the proof that the State has offered that the check was passed. The maker of the check, [the Defendant], was notified that the funds—that the check was returned insufficient, and there was no action taken to make it good within the prescribed period of time.

The trial court then told the Defendant that it would "take whatever proof that [she]—however [she] wish[ed] to offer it." The trial court noted that the Defendant had been sworn that morning as a witness and that she could now take the stand and provide her sworn testimony. Thereafter, the Defendant testified in narrative form.

The Defendant stated that she was aware the check had been returned, but that she believed it "had been made good." According to the Defendant, she was unaware that the delinquent taxes were still owed until the property was listed for sale again in 2017. The Defendant averred that her "normal policy" with the bank was that they would cover any check because she "had money coming in every day." She further claimed that she had a written agreement with the bank allowing them to transfer money between her accounts

"to cover a check to keep it from getting returned." The Defendant indicated that both she and the bank assumed the "second time [the check] was presented that it was paid."

Regarding the certified mail notice, the Defendant submitted that she did not purposefully refuse the notice, but rather due to her busy work schedule, she did not pick up her mail often, sometimes waiting two to three months at a time. The Defendant further indicated that around that time, she had been diagnosed with "three autoimmune diseases," and her mother passed away, causing her to neglect "a lot of things."

The Defendant asked the court to look at the evidence she provided in support of her motion to dismiss, which according to the Defendant, reflected that she had large sums of money in her account. The Defendant claimed that she had no fraudulent intent when she wrote the check and had she "known it was still out there, [she] would have made it good."

On cross-examination, the Defendant was asked if she knew there were insufficient funds in the account when she wrote the check; she claimed that the funds were there, but that Robbie Carter, a bank employee, had taken over $12,000.00 out of her account, which was what caused the check to bounce. The Defendant also claimed that she filed a police report against Mr. Carter, but that he was never prosecuted. The Defendant asserted that she repaid the bank the funds they spent paying the delinquent taxes. The Defendant also noted that she attempted to repay the money to the Clerk's Office within the same calendar year, claiming that the cashier's check was evidence of this. The Defendant confirmed that she no longer owned the property because the bank had foreclosed on it.

The Defendant was asked about her multiple convictions for passing worthless checks. She agreed that she had prior convictions for passing worthless checks in Putnam, Hamilton, Roane, and Knox counties. She agreed that other charges for passing worthless checks had been dismissed because she had made restitution in a timely manner. The Defendant further agreed that she been represented by an attorney in many of those cases.

On redirect, in an attempt to explain her prior charges and convictions, the Defendant said that she had nine businesses and often left signed checks with other individuals to pay bills. She noted that "a lot of money [was] flowing in, a lot of money [was] flowing out, and [she] wasn't always on top of who was paying what until it was after the case." According to the Defendant, "every single one of those" returned checks were made good, which she asserted was evidence of her intent in this case "to do the right thing."

Upon questioning by the trial court, the Defendant claimed that during this time period, normal deposits for her businesses were far in excess of the check to the Clerk's

Office. The Defendant confirmed that she received mail at the P.O. box where the bank sent the notice.

Following the conclusion of the proof, the trial court found the Defendant guilty as charged. The trial court entered an order to that effect on January 9, 2019. In the order, the trial court indicated that the Defendant appeared pro se for her trial and "announced that she was ready for trial in this cause after having previously waived her right to a trial by jury." The trial court then affirmed its conclusion that the Defendant was guilty.

On February 19, 2019, the trial court entered its sentencing decision, first determining that the Defendant was a Range I, standard offender. Then, after finding that the Defendant had a previous criminal history, but that her conduct neither caused nor threatened serious bodily injury, the trial court sentenced the Defendant to three years' incarceration, which sentence was to be suspended to ten years of supervised probation. An order was entered to that effect the following day. Thereafter, a judgment form was entered on March 7, 2019. The Defendant did not file a motion for new trial but instead filed a timely appeal.[5]

## ANALYSIS

### A. Waiver of Right to Counsel

On appeal, the Defendant contends that the trial court erred in determining that she made an explicit waiver of her right to counsel, which was knowing and voluntary, and by requiring her to proceed pro se at trial when she had not executed a written waiver to that effect in violation of Tennessee Rule of Criminal Procedure 44(b). Initially, the State responds that the Defendant's explicit waiver of her right to counsel was knowing and voluntary and that because Rule 44 only applies to indigent defendants, it does not entitle the Defendant to the relief she seeks. Alternatively, the State argues that the Defendant implicitly waived her right to counsel by failing to retain counsel in a timely manner.

The Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant a right to counsel. See Gideon v. Wainwright, 372 U.S. 335, 339 (1963); State v. Holmes, 302 S.W.3d 831, 838 (Tenn. 2010). The right to counsel is a constitutional safeguard "deemed necessary to insure fundamental human rights of life and liberty." Holmes, 302 S.W.3d at 838 (quoting Johnson v. Zerbst, 304 U.S. 45, 462 (1938)). As an alternative to that right, the accused

---

[5] The Defendant was not required to file a motion for new trial in order to preserve her issues on appeal under the Rules of Appellate Procedure because she was convicted at a bench trial. See Tenn. R. App. P.3(e) (providing that "in all cases tried by a jury, no issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for new trial").

may instead assert the right to self-representation. Lovin v. State, 286 S.W.3d 275, 284 (Tenn. 2009). Clearly, both rights cannot be simultaneously asserted. Id. The right to self-representation is guaranteed by the same constitutional provisions which provide for the right to counsel. Id.

Historically, courts have "assigned constitutional primacy to the right [to counsel] over the right to self-representation." State v. Hester, 324 S.W.3d 1, 30 (Tenn. 2010) (citations omitted). The exercise of the right to self-representation requires the waiver of the right to counsel. Id. Generally, in order to activate the right of self-representation, the defendant must: (1) timely assert the right to proceed pro se; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive her right to assistance of counsel. Id. at 30-31; State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). "[I]t is clear that it is representation by counsel that is the standard, not the exception." Hester, 324 S.W.3d at 30 (citing Martinez v. Court of Appeal of Cal., 528 U.S. 152, 161 (2000)). In accordance therewith and given the mutually exclusive nature of the rights, the Tennessee Supreme Court has observed that "[a] prisoner's statements and conduct can amount to a waiver of the prisoner's earlier unequivocal assertion of his right of self-representation" but that the "[c]ourts should [also] indulge every presumption against waiver of the right to counsel." Lovin, 286 S.W.3d at 288 n.15.

In determining whether a defendant intelligently and knowingly waived her right to counsel, the trial court must question the defendant extensively regarding her ability to represent herself. State v. Northington, 667 S.W.2d 57, 61 (Tenn. 1984); Herrod, 754 S.W.2d at 630. "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." Northington, 667 S.W.2d at 60 (quoting Von Moltke v. Gillies, 332 U.S. 708, 724 (1948)). To be valid, a defendant's waiver of her right to counsel "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." Von Moltke, 332 U.S. at 724.

In United States v. McDowell, the Sixth Circuit suggested a series of questions as a means of assuring a knowing and intelligent waiver of the right to counsel. 814 F.2d 245, 251-52 (6th Cir. 1987) (quoting "Guideline for District Judges" from1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed. 1986). In Smith v. State, this court adopted those questions and recommended that in cases where a defendant aspires to proceed pro se, the trial court utilize the litany of questions, or ask similar questions, to those found therein. 987 S.W.2d 871, 875 (Tenn. Crim. App. 1998) (for ease of reference, the guidelines were reprinted in the appendix to Smith); see also Herrod, 630 S.W.2d at

630. These questions inform the defendant of the nature of the charges and range of punishment she faces, as well as the fact that the defendant will be expected to conform to the Rules of Evidence and Criminal Procedure in trying the case. Id. at 877-78 (appendix). The trial court is advised to warn the defendant that self-representation is unwise. Id.

The trial court's determination regarding whether a defendant has properly exercised the right to self-representation and waived the right to counsel is a mixed question of law and fact reviewed de novo with a presumption of correctness. Hester, 324 S.W.3d at 29-30. The wrongful deprivation of the right to counsel is a structural error contaminating the proceedings to such a degree that reversal is mandated. Holmes, 302 S.W.3d at 838 (citations omitted).

The Defendant argues that she never made a clear and unequivocal assertion exercising her right to self-representation and that the trial court failed to follow Smith and the guidelines. She concludes that the trial court inferred that she wanted to proceed pro se and that the trial court's inadequate examination and inquiry prior to the determination of her ability to proceed pro se was not sufficiently extensive to ensure that her waiver of the right to counsel was knowingly and intelligently made.

Relative to whether the Defendant made a clear and unequivocal assertion exercising her right to self-representation, we note that her comments at the March 19, 2018 arraignment indicated that she expressed a desire to proceed pro se with her arraignment; she indicated that she would represent herself until her attorney could "get in" on her case. The Defendant further affirmed her understanding that she had "a right to a layer at any critical stage in [c]ourt" and that she had "a right to an appointed lawyer if [she could] not afford one." The Defendant continued to appear in court and represent herself at the hearings that followed on April 9, 2018, and June 18, 2018. At the April 9th hearing, the trial court noted that the Defendant was proceeding pro so and that they had gone "through that process before." The prosecutor also stated that the Defendant was proceeding pro se and that she was doing so at her own peril. At the June 18th hearing, the trial court noted that the Defendant was proceeding pro se, and the Defendant responded affirmatively. The trial court reminded the Defendant that she would be "held to same level of conduct and competence that a layer would be" at trial. The trial court also told the Defendant that she could still retain a lawyer if she so desired, though that lawyer would be required to "take the schedule." The trial court also observed that a lawyer might not have agreed with the Defendant's decision for a bench trial. The Defendant confirmed that she understood that her case was set for a non-jury trial in December. At the outset of the December 13, 2018 trial, the Defendant was asked if she had any questions; she informed the trial court that she was unable to secure local counsel and that she was unable to afford an out-of-town lawyer, so she would have to proceed for herself. The trial court also repeated that the Defendant would be held to a certain "level of competence."

From our review of the transcript and the overall tenor of the discussions between the trial court and the Defendant, we conclude that the Defendant initially expressed her intention to proceed pro se at arraignment and that she continued to affirm in subsequent proceedings that she was appearing without counsel. In addition, the Defendant acknowledged that she had been represented by counsel in many of her prior cases that resulted in convictions for passing worthless checks, as well her being represented by counsel in general sessions court in this case. "One with means and ability to employ counsel is not indigent, and [she] cannot be permitted to frustrate the process of the law and completely thwart and avoid trial indefinitely by just not employing counsel." Glasgow v. State, 461 S.W.2d 25, 27 (Tenn. 1970). Accordingly, we conclude that the record is clear that the Defendant understood her right to counsel and that her decision to proceed pro se was clear and unequivocal based upon her statements and conduct. See, e,g., id. at 28 (holding that a non-indigent defendant waived the right to counsel because he refused to hire an attorney).

Regarding whether the colloquy was compliant with the Von Molke requirements, as elaborated on in Smith, we observe that the trial court in the case herein did assess the Defendant's age and education and informed her that she would be held to the same standard as a lawyer. The fifty-six-year-old Defendant stated that she had a college degree in "[b]usiness management, computer programming, . . . an accounting degree." The trial court asked the Defendant if she had studied the law in any respect, and she said that she had "a legal minor" in "business contracts." The trial court likewise asked the Defendant if she was familiar with the United States and Tennessee Constitutions. She confirmed her knowledge of both documents, likewise affirming her awareness that they "would protect [her] in certain areas concerning law enforcement and cases that [she] might be subject to go to trial on," though she had never read them. The trial court also informed the Defendant that there were "court rules . . . that appl[ied] exclusive[ly] to here," and the Defendant indicated that she understood. The trial court also stated that it would provide a copy of the local rules to the Defendant. In addition, the trial court advised the Defendant that she faced a Class D felony if convicted, which was subject to two to twelve years in prison and a $5,000.00 fine. Finally, the trial court advised the Defendant that regardless of whether the check had been paid, the State had the election to proceed and such was not a defense to prosecution.

Though the Defendant was not specifically warned that self-representation was unwise or about the pitfalls of self-representation, she was aware of what she faced in this prosecution in that she had prior convictions for passing worthless checks in four Tennessee Counties. At the April 9th hearing, the prosecutor indicated that the Defendant had approached him that morning asking for discovery and that he explained to her that she had to file the appropriate motions pursuant to the rules of procedure. The prosecutor also stated in court that the Defendant was representing herself and that she was "doing so

at her own peril." At the June 8th hearing, the trial court commented that a lawyer might not have agreed with the Defendant's decision for a bench trial. The Defendant also filed her own motion to dismiss prior to trial, which included exhibits.

At each hearing, the trial court discussed the legal issues with the Defendant, and she made appropriate replies. She never questioned the court's understanding that she was appearing pro se at any of the pre-trial hearings or at trial. While the instant court did not mechanically ask all of the questions suggested, we conclude that the court substantially complied with the suggested format. See, e.g., State v. Goodwin, 909 S.W.2d 35, 41-42 (Tenn. Crim. App. 1995); State v. Joseph Antonio Hough, No. E2000-02728-CCA-R3-CD, 2002 WL 1483203, at *5 (Tenn. Crim. App. July 11, 2002); State v. Vincent Hatch, No. W2000-01005-CCA-R3-CD, 2001 WL 1268442, at *16 (Tenn. Crim. App. Oct. 19, 2001); State v. Mohamed F. Ali, Nos. 03C01-9802-CR-00065, 03C01-9809-CR-00310, 1999 WL 639689, at *3-4 (Tenn. Crim. App. Aug. 24, 1999); Luther E. Fowler v. State, No. 03C01-9711-CR-00509, 1999 WL 552938, at *10-11 (Tenn. Crim. App. July 30, 1999) (all cases reaching similar conclusions of substantial compliance with McDowell and Smith). Accordingly, we find that inquiry here was sufficient to comply with Von Moltke and that the Defendant, given her background and the nature of the charge, made a knowing and voluntary waiver of her right to counsel.[6]

Next, we will address the Defendant's argument that Tennessee Rule of Criminal Procedure 44 requires a written waiver for both indigent and non-indigent defendants. Rule 44 is titled "Right to and Assignment of Counsel." Subsection (a) discusses the "Right to Assigned Counsel," and states, "Every indigent defendant is entitled to have assigned counsel in all matters necessary to the defense and at every stage of the proceedings, unless the defendant waives counsel." Tenn. R. Crim. P. 44(a). Then subsection (b) outlines what is required for a valid waiver. It requires that the trial court, prior to accepting a waiver of the right to counsel, advise the accused of the right to the assistance of counsel at all stages of the proceedings and inquire into the background, experience, and conduct of the accused to determine whether waiver is competent and intelligent. Tenn. R. Crim. P. 44(b)(1). The Rule further requires the waiver to be in writing and included in the record. Tenn. R. Crim. P. 44(b)(2)-(3). Subsections (c) and (d) address the "Procedures for Appointment of Counsel" and the trial court's obligation regarding the "Inquiry Into Joint Representation." Tenn. R. Crim. P. (c), (d).

As the State observes, this court, in analyzing a prior version of Rule 44, concluded "it is not clear whether the requirements of Rule 44(a) apply to other than indigent

---

[6] Because we find an explicit waiver, we find it unnecessary to address the State's alternative claim of an implicit waiver.

defendants." State v. Armes, 673 S.W.2d 174, 177 (Tenn. Crim. App. 1984).[7] The Armes court also commented that "the best procedure would require a written waiver of counsel in all cases where an accused insists on self-representation." Id. Since Armes, Rule 44 has been amended, and the waiver provision now appears in subsection (b) and is separate from the language in subsection (a) pertaining to the right to assigned counsel for indigent defendants. However, we believe from the context of present Rule 44 that the amendment is a distinction without a difference.

While written waiver of counsel would provide prima facie evidence of an explicit waiver of the right to counsel, Rule 44 only requires such if a defendant is indigent. Cf. Glasgow, 461 S.W.2d at 25 (holding that then Tennessee Code Annotated section 40-2015, which required a written waiver, applied only to the appointment of counsel for indigent defendants, not to the appointment of counsel for non-indigent defendants). This court has recently held that "Rule 44 is not plainly applicable" when a defendant's indigency status is unclear. Dennis R. Bolze v. State, No. E2018-01231-CCA-R3-PC, 2019 WL 1988679, at *2 (Tenn. Crim. App. May 6, 2019), perm. app. denied (Tenn. June 6, 2019). Moreover, this court has held that a trial court's failure to comply with the writing requirement of Tennessee Rule Criminal Procedure 44 does not necessarily preclude a constitutionally valid waiver. See, e.g., Vincent Hatch, 2001 WL 1268442, at *6; Mohammed F. Ali, 1999 WL 639689, at *4; Luther E. Fowler, 1999 WL 552938, at *10-11 (all cases finding a constitutionally valid waiver of the right of counsel and no reversible error despite the lack of a written waiver in the record). For all these reasons, Rule 44 does not entitle the Defendant to the relief she seeks.

## B. Compelled to Testify

The Defendant also argues that the trial court violated her constitutional rights when it compelled her to testify against herself. According to the Defendant, "the trial court made many comments regarding [her] necessary proof that pressured her to testify against

---

[7] At the time of the Armes opinion, Rule 44 stated,

> Every indigent defendant shall be entitled to have counsel assigned to represent him in all matters necessary to his defense and at every stage of the proceedings, unless he executes a written waiver. Before accepting such waiver the court shall first advise the accused in open court of his right to the aid of counsel in every stage of the proceedings. The court shall, at the same time, determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience and conduct of the accused and such other matters as the court may deem appropriate. Any waiver accepted shall be spread upon the minutes of the court and made a part of the record in the cause.

Tenn. R. Crim. P. 44(a) (1984).

her constitutional right to silence." Specifically, in support of this argument, the Defendant cites the trial court's comment "that it was 'evident' that the State put forth its proof, 'however' she could, implying that she had a burden to prove her case"; and the trial court's comment "that it was 'not exactly sure how [she] intend[ed] to get [her] proof in without being questioned,' even though she had a constitutional privilege to not be a witness against herself." The State responds that the trial court properly permitted the Defendant to testify on her own behalf at trial.

The first challenged comment about it being "evident from the proof that the State ha[d] offered that the check was passed" was made by the trial court in ruling on the Defendant's motion for judgment of acquittal. Following that determination, the trial court stated that it would take "whatever" proof the Defendant wished offer. While the trial court did remark that it was unsure how the Defendant wished to offer her proof "without being questioned," the Defendant had already provided the trial court with details of her defense through argument, and she had previously expressed an interest in testifying at the outset of trial when the presentation of witnesses was discussed and she was sworn. No other witnesses were offered by the Defendant during that initial discussion.

The Fifth Amendment guarantees an accused the right to remain silent during her criminal trial and prevents the prosecution for commenting on the silence of a defendant who asserts the right. Griffin v. California, 380 U.S. 609, 614 (1965). A defendant in a criminal case also has a fundamental right to testify in her own defense, see Rock v. Arkansas, 483 U.S. 44, 51 (1987), but may not be compelled to do so. The Supreme Court has recognized that

> [t]he defendant in a criminal trial is frequently forced to testify [her]self and to call other witnesses in an effort to reduce the risk of conviction. . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.

Williams v. Florida, 399 U.S. 78, 83-84 (1970); see also Harrison v. United States, 392 U.S. 219, 222 (1968) (observing that "[a] defendant who chooses to testify waives [her] privilege against compulsory self-incrimination . . . , [even though] the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against [her]").

Here, we do not believe that the trial court improperly infringed upon the Defendant's right to remain silent. An accused's need or decision to present a defense does not produce compulsion. From our review of the trial court's comments as a whole, we cannot find any indicia of compulsion or coercion on the part of the trial court forcing the Defendant to testify. See, e.g., United States v. Perkins, 937 F.2d 1397, 1404-05 (9th Cir.

1991) (concluding that a defendant's "tactical decision to testify" based on his "own subjective perception of what constitutes a proper trial strategy" did not violate the Fifth Amendment's privilege against self-incrimination, even if the defendant felt it necessary to testify because of the district court's evidentiary rulings).  The Defendant is not entitled to relief from this issue.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.


_____

D. KELLY THOMAS, JR., JUDGE